## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 27 2018, 9:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

ATTORNEY FOR APPELLANT

Steven Knecht
Vonderheide & Knecht, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Aaron T. Craft
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

In re the Termination of the Parent-Child Relationship of An.C. and Aa.C. (Minor Children) and

C.C. (Father),

*Appellant-Defendant,*

v.

Indiana Department of Child Services,

*Appellee-Plaintiff.*

March 27, 2018

Court of Appeals Case No.
91A02-1710-JT-2360

Appeal from the White Circuit Court

The Honorable Robert W. Thacker, Judge

Trial Court Cause Nos.
91C01-1704-JT-3
91C01-1704-JT-4

---

**Mathias, Judge.**

[1] C.C. ("Father") appeals the order of the White Circuit Court terminating his rights to his minor children, An.C. and Aa.C. (collectively "Children"). On appeal, Father contends that the Indiana Department of Child Services ("DCS") presented insufficient evidence to support the trial court's decision to terminate his parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Twin boys An.C. and Aa.C. were born to V.G. ("Mother")[1] and Father on May 2, 2011. On January 20, 2016, Children were removed from Father and placed in foster care based on Father using heroin in the children's presence, Father's lack of supervision of the children, and the fact that Father reportedly drove the children while under the influence of drugs. Father then tested positive for morphine one day after Children's removal. On January 22, DCS filed a petition alleging An.C. and Aa.C. were children in need of services ("CHINS").

[4] On April 1, 2016, Children were adjudicated to be CHINS and on May 20, a dispositional hearing was held, and the trial court issued a dispositional decree with respect to each child. As part of the decree, Father was ordered to: (1) contact the DCS family case manager on a weekly basis; (2) notify the family case manager of any changes in address, household composition, employment,

---

[1] Mother resides in Maryland, and she voluntarily relinquished her parental rights. She does not participate in this appeal.

or telephone number; (3) notify the family case manager of any arrests or criminal charges for any household member; (4) allow the family case manager or other service providers to make announced or unannounced visits to the home; (5) participate in any program or assessment recommended by the family case manager; (6) keep all appointments; (7) sign any releases necessary for the family case manager to monitor compliance with the terms of the order; (8) maintain safe, suitable, and stable housing; (9) secure and maintain a legal and stable source of income; (10) refrain from using, manufacturing, or distributing illicit drugs and take medications only as prescribed; (11) not consume any alcohol; (12) obey the law; (13) complete a substance abuse assessment, follow all recommended treatments, and successfully complete all treatment recommendations developed as a result of the substance abuse assessment; (14) submit to random drug or alcohol screens; (15) meet all personal medical and mental health needs; (16) attend all scheduled visitations with Children and comply with the visitation rules and procedures; and (17) work with a home based case manager to obtain employment and stable housing. Ex. Vol. 4, Petitioner's Ex. 4.[2] A permanency hearing for both cases was held on November 14, but Father was incarcerated at the time and did not attend.

[5] In March 2016, Father underwent a substance abuse assessment and was recommended for individual therapy. On March 30, Father began meeting with

---

[2] This is the dispositional order for An.C. The order for Aa.C. is virtually identical notwithstanding the change in name. *See* Ex. Vol. 4, Petitioner's Ex. 5.

Ted Eckerle ("Eckerle"), a therapist at Wabash Valley Alliance. Father's attendance "was very sporadic" and he only showed up for thirteen sessions over a sixteen-month period. Tr. p. 31. And during this time, Father "had a couple of no shows." *Id.* Father did not make much progress during their time together, specifically with regards to employment or finding a stable place to live. *Id.* at 32. Eckerle explained, "I always questioned how motivated [Father] was just because he didn't seem to be making much progress with finding employment or wanting to find a place of his own which he talked about but never really happened." *Id.* Additionally, Father's pervasive and continuing drug use was a consistent issue during his time with Eckerle and others.

[6] Between March and August 2016, Father tested positive for morphine seven times. From September 2016 to December 2016, Father was incarcerated. Soon after his release, Father tested positive for alcohol on December 30. Father then went for a little over two months without a positive drug screen. However, between March 2, 2017, and May 24, 2017—when he stopped showing up for his drug screens—Father tested positive for morphine eleven times, methamphetamine three times, nordiazepam twice, alcohol once, oxycodone once, and oxazepam once. Tr. p. 103; Ex. Vol. 3, Petitioner's Exs. 1–3.

[7] Because of his failed drug screenings, Father was referred for the addictions program through Wabash Valley Alliance in April 2017. He attended three times in April, then stopped showing up. Tr. p. 51. Father attended again in May, but he only showed up twice, and he was not seen after May 23. *Id.* The therapist in charge of Father's addictions group therapy indicated that he made

no progress toward treating his drug addiction during his two brief stints in the program. *Id.* at 51–52.

[8] Despite his drug use and inconsistent attendance with services provided, Father was consistent with his supervised visits with Children. Beth McClyde ("McClyde"), of Promising Futures, provided case management and supervised visits for Father from February 2016 until January 2017. She testified that during the weekly visits, Father was patient with Children, interacted with them appropriately, and maintained his composure during an outburst by An.C. *Id.* at 42–43. But Father made little to no progress in finding employment, stable housing, staying sober, or avoiding trouble with law enforcement. *Id.* at 43–44.

[9] David Ifedi ("Ifedi") took over case management and Father's supervised visits in early 2017. Ifedi explained that while Father was consistent with the visits, "he had multiple no-shows" for the case management. *Id.* at 57. Thus, although Father acted appropriately with Children during the visits, he made no progress with regard to finding stable housing, securing employment, or taking part in drug treatment. Ifedi explained this was because Father did not attend many of the sessions, and when he did, "he didn't want to do much." *Id.*

[10] The closest Father came to secure a stable residence during the CHINS proceedings was in his father's trailer that is owned by his grandparents. However, the trailer "wasn't a good environment for someone trying to get clean," because of his father's and brother's alcoholism and habitual drug use respectively. *Id.* at 45–46. Moreover, Father's grandparents no longer allow

Father on their property "[b]ecause he brings his dad alcohol." *Id.* at 87. Father reported that he stayed with a girlfriend for a short time, but also that he sometimes slept in his car. *Id.* at 58.

[11] Regarding employment, Father secured a job a Jordan's Manufacturing shortly after he was released from prison in December 2016. But he only held that job for roughly two months. And during this time when Father was clean, he told his case manager that "he was actually doing some scamming to get money illegally." *Id.* at 49. Once Father quit working at Jordan's Manufacturing, he remained unemployed and showed little to no interest in gaining employment. *Id.* at 57–58.

[12] Father also had four encounters with law enforcement while the CHINS cases were pending. He was arrested in August 2016 for stealing from a Hobby Lobby. Later that month, Father was arrested for possession of a controlled substance and subsequently spent two and one-half months in jail. In May 2017, Father was arrested when he and another individual attempted to steal a tire off of a vehicle. And later that month, he was arrested and charged with criminal trespass for coming on to the property of his father's trailer against the wishes of the property owners—his grandparents. Father also has a prior conviction for felony trafficking for attempting to deliver drugs to his incarcerated brother.

[13] On April 26, 2017, DCS filed petitions to terminate Father's parental rights. The trial court conducted an evidentiary hearing on the petitions on July 21,

and Father did not attend.[3] On September 11, the trial court entered findings of fact and conclusions of law granting DCS's petitions and terminating Father's parental rights. Father now appeals.

## Termination of Parental Rights

[14] We have consistently noted that the purpose of terminating parental rights is *not* to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for the termination of such rights when the parents are unable or unwilling to meet their responsibilities as parents. *Id*. Indeed, the parent's interests must be subordinated to the children's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[15] The termination of parental rights is controlled by Indiana Code section 31-35-2-4(b)(2), which provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

---

[3] Father's grandmother testified that the night before the hearing, he was "drugged up" and "trying to get money off his father to buy drugs." Tr. p. 87.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

[16] The burden is on DCS to prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *G.Y.*, 904 N.E.2d at 1261. As Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of that subsection has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a). If the court does not find that the allegations in the petition are true, it shall dismiss the petition. *Id.* at § 8(b).

[17] We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion*

*Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.

[18]  Indiana Code section 31-35-2-8(c) provides that the trial court "shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" to either terminate a parent-child relationship or to dismiss the termination petition. When the trial court enters such findings and conclusions of law, we apply a two-tiered standard of review. *A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. We first determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Id*. (quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)). If the evidence and inferences support the trial court's decision, we must affirm. *Id*.

## Discussion and Decision

[19]  On appeal, Father challenges the sufficiency of the evidence supporting the trial court's decision to terminate his parental rights. Specifically, Father claims that there is insufficient evidence to support the trial court's conclusions: (1) that there was a reasonable probability that the conditions which led to Children's removal from Father's care would not be remedied; (2) that the continuation of the parent-child relationship posed a threat to the well-being of Children; and (3) that termination of Father's parental rights was in Children's best interests.

### A. Conditions Which Led to Children's Removal

[20] Father contends that the trial court erred in determining that the conditions which led to Children's removal from Father or their placement outside Father's home will not be remedied. In deciding whether there is a reasonable probability that such conditions will not be remedied, the trial court must determine a parent's fitness to care for the child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S.*, 987 N.E.2d at 1156–57. However, the trial court may disregard efforts made only shortly before termination and weigh more heavily a parent's history of conduct prior to those efforts. *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[21] Father claims that although he "has not had a great deal of success so far in dealing with addiction, or his unstable housing or employment situation . . . there are indications that Father can [now] make the necessary changes." Appellant's Br. at 16–17. He cites in support the nearly three-month period after his December 2016 release from prison during which he was sober and secured stable employment. However, Children were removed from Father's care due to his use of and addiction to illicit drugs. And Father lost the job he secured after being released from prison, and he then proceeded to test positive for illicit drugs eleven times between March 2, 2017 and May 24, 2017, when he stopped showing up for drug screens. He also sporadically attended treatment sessions, and when he did show up, he lacked any motivation to make the necessary substantive changes in his life. *See, e.g.,* Tr. pp. 46–49, 57, 111–12. As the trial

court aptly stated in its findings, "Unless Father is able to overcome his drug addiction, he will probably never be able to break the cycle of crime, unemployment, and homelessness." Appellant's App. p. 22.

[22] Therefore, under these facts and circumstances, we cannot say that the trial court clearly erred in concluding there was a reasonable probability that the conditions that resulted in Children's removal from Father's care, or the reasons for Children's continued placement outside Father's home, i.e. Father's use of illicit drugs, would not be remedied.

*B. Continuation of Parent-Child Relationship*

[23] Father also argues that the trial court erred in determining that the continuation of the parent-child relationship poses a threat to Children's well-being. Because we conclude that DCS proved that there was a reasonable probability that the conditions which resulted in Children's removal from Father's care would not be remedied, we need not address Father's arguments directed at the threat prong of Indiana Code section 31-35-2-4(b)(2)(B). *See In re A.K.*, 924 N.E.3d at 220 (noting that section 4(b)(2)(B) is written in the disjunctive and that the trial court is required to find that only one prong of subsection (b)(2)(B) has been established).

[24] However, even if we did consider Father's argument under the threat prong, he would not prevail. In addressing the "threat" prong of section 4(b)(2)(B), the trial court must consider the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *A.D.S.*, 987 N.E.2d

at 1157. The trial court may consider evidence of a parent's prior history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* DCS is not required to provide evidence ruling out all possibilities of change. *Id.* Instead it needs to establish only that a reasonable probability exists that the parent's behavior will not change. *Id.*

[25] We recognize that Father has a bond with Children, and many testified that his visitations with Children were consistent and positive. But Father repeatedly tested positive for illicit drugs, and he never established stable housing or consistent employment. Nor did he successfully complete any of the services DCS offered to him. He was also arrested four times while the CHINS proceedings were ongoing, and he served approximately two and one-half months in jail. Moreover, on the night before the evidentiary hearing, which he did not attend, Father showed up at his father's home "drugged up" and "trying to get drug money." Tr. p. 87. Accordingly, the trial court did not clearly err in concluding that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Children.

*C. Best Interests of the Children*

[26] Father lastly claims that the trial court clearly erred in concluding that termination of his parental rights was in the best interests of Children. In determining what is in the best interests of the child, the trial court must look beyond the factors identified by DCS and look to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. The trial court must subordinate the interests of the

parent to those of the child, and the court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id*.

[27] Here, we note that Father failed to complete any of the services offered to him. He repeatedly tested positive for use of illicit drugs. He did not complete any of the substance abuse programs to which he was referred. Father was also arrested four times throughout the CHINS and termination proceedings, and he failed to secure or maintain stable housing or employment. Moreover, Children excelled in foster care, and their foster parents intended to adopt them. Children's therapist testified that "[t]he progress they've made is actually phenomenal." Tr. p. 63. In light of these facts, we cannot say that the trial court clearly erred in determining that termination of Father's parental rights was in the best interests of Children

[28] Father indicates that both the Children's therapist and Guardian Ad Litem ("GAL") testified that Children would grieve the loss of their Father if the relationship was severed. This may be true; however, the therapist also testified that if Children were put back into an unstable environment with Father "they would regress" and "it would be a pretty quick trigger backwards." *Id.* at 70. And the GAL testified that although Children would grieve the loss of the relationship with their Father, the risk of Children's regression from going back to Father in his current state would be far worse. *Id.* at 122. Children need stability and permanency, which Father has shown no ability to provide, and which Children are close to gaining in their foster parents' home. Accordingly,

the trial court did not clearly err in concluding that termination of Father's parental rights was in the best interests of his Children.

## Conclusion

[29] We have no reason to doubt Father's claims that he and his two sons love one another and are bonded. But that does not make the termination of his parental rights improper; it merely makes it all the more heartbreaking that Father has proven himself incapable of overcoming his substance abuse problem. Father's argument on appeal is little more than a request for us to reweigh the evidence and come to a conclusion different than that reached by the trial court. This we cannot do. Considering the facts most favorable to the trial court's decision, and the reasonable inferences that may be drawn therefrom, we cannot say that the court clearly erred in terminating Father's parental rights.

[30] Affirmed.

Najam, J., and Barnes, J., concur.